TYACK and othes *v.* BROMLEY *et al.*

The act of the legislature of the 19th February, 1819, authorized a board of
port wardens, under the style of the master and wardens of the port of
New York, with a common seal and who should have an office and clerk
and power to survey vessels deemed unfit for sea and to judge of their
necessary repairs to perform the voyage and to inspect sales of vessels
and goods arriving damaged and required to be sold for the benefit of
underwriters out of the city of New York and to grant certificates and
receive fees and their appointment making them public officers: *Held,*
that they had exclusive right to perform the duties specified by the act.
And, that an association of persons advertising to survey ships and mer-
chandize, setting up an office close by that of the port wardens and call-
ing themselves " Marine surveyors for the port of New York, appointed
by the chamber of commerce and board of underwriters," and giving out
that they performed the same duties as the port wardens and that their
acts would be more authentic than those of the port wardens, had no
right to execute any of the statutory duties appertaining to the office of
the latter. And, *it seems,* they had brought themselves within the prin-
ciple of the cases connected with simulated devices and deceits.

The legislature, making a grant to some, may afterwards make a similar
grant to others ; but, without such latter grant, the former have exclusive
right and no express prohibition or restraining law is necessary to pre-
vent rivalry. The grant implies a prohibition.

*It would seem* that a statutory grant of fees or perquisites carries with it an
exclusive right to perform the services that earn them.

Chancery can act, although there may be a remedy at law: as, where re-
peated actions might have to be had or remedies at law are not full or
adequate.

Although it is not proper for equity to restrain, in the first instance, where
there is doubt or difficulty on the law or the facts, yet, it will restrain by
injunction, without first requiring the establishment of right at law where
a clear case of statutory or common law right is presented and the party
is in the possession and enjoyment of a right which is daily or continually
violated or threatened to be destroyed or rendered valueless.

June 16,
1843.

Port War-
dens.
Simulated
devices and
trade
marks.
Statute.
Legisla-
tive grant.
Jurisdic-
tion.
Injunction.

BILL by William Tyack, Harry Parsons, Anthony Mof-
fat, Richard H. Tittle, William C. Neilson and William
Newcomb, describing themselves as the master and war-
dens of the port of New York and William Hall their
clerk. It set forth that the office of wardens of the port of
New York was of long standing; and their duties were
beneficial to the community and to commerce and the com-

mercial marine of the port. That before and since the formation of the government of the United States and of the State of New York, acts of the legislature as well colonial as of state authority had been passed, from time to time, establishing, confirming and recognizing the office and regulating the discharge of its duties. That the statute law of the state of New York, under which the office at present existed and through which the complainants derived their right was the act, entitled, " An act to reduce several laws relating particularly to the city of New York into one act, so far as the same relates to the master and wardens, harbour masters and pilots of New York and their duties and for other purposes," passed February 19th, 1819, by which, *inter alia*, a board of wardens for the port of New York was established, to consist of a master and five wardens, to be known by the name of " the master and wardens of the port of New York," who were to have and use a common seal ; administer oaths touching the business of the board and sue for fines and penalties ; while the officers were to take oath faithfully to perform their office ; and were authorized to appoint a clerk. They were directed (in such act) to keep an office in the city of New York, have books of minutes, &c. Also, by such act, it was declared that every vessel arriving in the port of New York (except vessels belonging to a citizen and such as were permitted by law to enter on the same terms) were to be reported at the office of the said board of wardens under the penalty of fifty dollars for each neglect ;—the owners of which were to pay for each vessel certain fees therein specified to be sued for and recovered in the said name of the master and wardens of the port of New York. Also, (by the said act,) that the said master and wardens or any two of them, with the assistance of one or more skilful carpenters, were to be surveyors of any vessel deemed unfit to proceed to sea and such wardens were to be judges of the repairs which might be necessary for such vessel on her voyage ; and in all cases of vessels and goods arriving damaged and required to be sold at auction for the benefit of underwriters out of the city of New York such sale was to be made under the inspection of the said master and wardens, who

were to certify the cause of such damage, the amount of
sales and charges of sale and were to be allowed for their
services and for every survey on board, &c. &c. Certain
fees and emoluments were prescribed; and such fees, &c.
were to be equally divided between the said master and
wardens and their clerk.

Also, the bill alleged that the said office of wardens of
the port of New York was classed, and named among other
offices of the state of New York by the statute contained
in the revised laws providing for the number, location and
classification of public officers of the state and their mode
of appointment. That the complainants had been regular-
ly appointed, whereby they became entitled to the fees and
emoluments of the office; and they well hoped that they might
have enjoyed the same, but that the defendants Reuben
Bromley, Thomas H. Merry, Russell Sturges, Alexander J.
Cartwright, Joseph Tinkham, Samuel Candler and Robert
T. Norris, had openly alleged that the office was a mo-
nopoly and that they had a right to execute similar duties
and pretended and gave out that it was necessary; that
what was usually called "Lloyd's" or "Lloyd's Coffee
House," at London, in England, was an association that con-
trolled insurance and premiums on marine risks and should
be represented in the board of wardens and that one of the
persons performing the duties of the complainants should
represent the interest so called Lloyd's and that these com-
plainants had not discharged their duties in a proper man-
ner; and that the defendants had opened an office in the
said city of New York for the performance of duties which
would otherwise devolve upon the complainants by virtue
of their office of port wardens and had hired rooms adapted
to such purpose at No. 67 Wall street, New York, which
was near to the office of the complainants and had issued
circulars giving themselves out to the public as a board of
persons authorized and competent to perform marine ser-
vices and the duties of port wardens; and that they openly
delared their design was to put down the office of the com-
plainants and to deprive the latter of the business and
emoluments of the same. The bill charged an attempt at
usurpation of office. Also showed that the defendants, in

furtherance of their plan, had made and executed surveys
of damaged goods and merchandize and made and granted
certificates in, apparently, official form similar to certificates
granted by the complainants; that this was done on board
the ship Garrick, the ship Yazoo, the brig Ponce, the ships
Orleans, St. Mary and Levant and of other goods and mer-
chandize on board of other vessels in the port of New York;
and all of which were cases contemplated by the said act
of the legislature imposing duties which belonged to and
devolved upon the complainants by virtue of their said
office. Also, that it happened that the ship Florida, lying
in the port of New York, after having taken in a cargo and
finished lading, sprung a-leak, on which it was necessary
to decide whether the said vessel should be discharged of
her cargo or proceed to sea, whereupon the said defendants
busied themselves and, assuming the functions of the office
duties of the complainants, pretended to make the necessary
survey for repairs and made a survey in the premises:
*Prayer*: That the exclusive rights of the said complain-
ants to the said office might be decreed; and that the de-
fendants might be perpetually enjoined from molesting, in-
terfering with or disturbing the complainants or any of
them in the use, enjoyment or exercise of the said duties
respectively appertaining to the complainants as the master
and wardens of the port of New York and their clerk and
from taking the fees thereof and from demanding or receiv-
ing fees or emoluments from any person or persons for any
such services; and from acting as surveyors of any vessel
deemed unfit to proceed to sea and from judging or acting
as judges of the repairs which might be necesary for the
safety of such vessel on the intended voyage and from
selling, under their inspection, vessels or goods arriving at
the port of New York damaged and for the benefit of un-
derwriters out of the city of New York and from certifying
the cause of such damage, the amount of sale of such ves-
sel or goods and the charges attending the sale and from
taking or making any survey on board of any ship or vessel
or at any store in the city of New York or along the docks
or wharves thereof or damaged goods and from giving or
granting any certificate in consequence of damaged goods

1843.

TYACK
*v.*
BROMLEY.

1843.

TYACK
*v.*
BROMLEY.

and from taking or making any survey on board of or rela-
ting to any ship or vessel put into the port of New York in
distress, to ascertain the damage sustained thereby and whe-
ther any such ships or vessel shall pay or be liable for foreign
duties and tonnage or otherwise.

An order had been granted for the defendants to show
cause why an injunction should not issue.

Mr. *Benjamin F. Butler* and Mr. *H. S. Mackay*, for the
complainants, referred to 1 Greenleaf's Stat. 78, 83, 86 ; 5
Laws of New York, 11 ; 4 J. C. R. 48, 160 ; 5 Ib. 100, 300 ;
1 Ib. 611, 615 ; 9 Wheaton, 209, 749, 841 ; 8 Paige's C. R.
74 ; 9 Ib. 507 ; 1 Smith & Liv. 169 ; Drury on Injunctions,
chap. 4, p. 230 ; 2 Keen, 213 ; *Foster's Case*, 11 Coke, 59,
64 ; 2 J. C. R. 164 ; Hopkins C. R. 416 ; 1 Paige's C. R.
447 ; 2 Atk. 392 ; 1 R. S. 530, § 9.

Mr. *F. B. Cutting*, contra, read affidavits which are re-
ferred to by the court and, also, quoted from 2 R. S. 697 ; 5
Bac. Abr. 199 ; 2 R. S. 581, § 28, 30, 32, 34 ; 2 Atk. 483 ;
Ib. 391 ; 6 Bro. P. C. 575 ; 1 Bro. C. C. 40 ; Ib. 572 ; 7 J.
C. R. 336 ; 2 Ib. 261 ; Jeremy's Eq. Jur. 344 ; 4 Bingham,
183 ; Dwarris, 749 ; 1 Story's Laws of U. S. 625, § 60 ; 1
R. S. 508, § 177, 181 ; Ib. 535 ; Laws of 1835, p. 203 ; 1 R.
S. 405, 454 ; 11 Peters, 420.

*Aug.* 8.          THE VICE-CHANCELLOR :—The complainants compose
the board of port wardens of the port of New York and to
which office they were appointed by the governor and
senate of the state ; and the defendants are an equal num-
ber of persons who have assumed the name of " Marine
surveyors for the port of New York," and have undertaken
to perform many of the duties which the complainants
claim to belong exclusively to them by virtue of their
office. It is the principal object of the bill to restrain the
latter from such interference.

The bill, in the first place, refers to the laws of the state
creating the office of master and wardens of the port ; and
it, then, shows that the complainants have been only ap-
pointed and taken the oath of office and are in discharge of

the duties thereof and, as such incumbents, they insist that they are entitled to perform all the duties and transact all the business appertaining to the office and to receive all the fees and emoluments thereof, but that the defendants fraudulently intending to injure the complainants in the enjoyment of their office and to interrupt and disturb them therein, have, under various unfounded pretences, set about depriving them of their business and have opened an office contiguous and nearly opposite to the location or office of the complainants in the same street from which the defendants have issued a circular and cards of business, holding themselves out to the public as a board authorized and competent to perform the duties of the complainants in relation to marine surveys.

The defendants show, by their affidavits—not having as yet answered the bill—that having been appointed by the Chamber of Commerce and Board of Underwriters of the city of New York "to survey ships and merchandize," they issued a circular headed "Marine Surveyor's Office," and dated May 25th, 1843, announcing the fact of such appointment, and that they had taken an office, No. 67 Wall street, for the accommodation of merchants and masters of vessels to be kept open daily throughout the year, and that their charges for services would be as follows: For every survey on board vessels and on merchandize, $2; for every certificate of the same, $1; for every survey on vessels put into this port in distress or needing repairs, $2 50; for every certificate of the same, $2 50. They also issued a card in these words: "Marine Surveyors, Port of New York, appointed by the Chamber of Commerce and Board of Underwriters, office 67 Wall street"—with their names. The defendants also exhibit a certificate, dated June 9, 1843, from the Chamber of Commerce and the Board of Underwriters, stating that the defendants were appointed by their respective boards as suitable persons to act as Marine Surveyors for the port of New York and recommending them accordingly in all cases where their services might be required. Still, in their affidavits, they disclaim all interference with vessels or goods arriving at the port of New York in a damaged state which may be required to be sold at auction for the benefit of un-

derwriters out of the city of New York. They do not, however, deny what is very strongly imputed to them in the charging part of the bill, namely, that they have fraudulently combined to injure the complainants; to interrupt them in the enjoyment of their office; and to deprive them of the business and emoluments belonging to it. Nor do they deny that they have set on foot the plan of opening and keeping an office for that purpose, and that they do openly and publicly declare that their design is to put down the office of the complainants by discharging the duties thereof themselves, and that they have assimilated their association and their mode and manner of doing business as near as may be to the organization and arrangement of the complainants, giving out that they perform the same duties and may be relied on as being more competent and that their acts will be more authentic. Nor do they deny that they have held surveys of damaged goods on board of a number of vessels or granted certificates in apparently official form, similar to certificates granted by the complainants in like cases and in one instance, (the case of the ship Florida, which had finished taking in her cargo and, while in port, had sprung aleak,) put themselves forward to make the necessary survey for repairs and had either made such survey or were then engaged in making it, in defiance of the complainants. Neither do they deny that the complainants have remonstrated with them and requested them to desist and that they refused and still give out that it is their deliberate intention to continue their opposition and to use all their influence entirely to supplant them in their official business. These and other charges in the bill not being denied, must, for the purposes of the present application, be taken as true. Whether the motives with which this opposition has been got up and is persevered in, as charged, can have any influence upon the question of this court's jurisdiction, it may become necessary to inquire. But the first question to be considered is: what are the complainants entitled to, *virtute officii?* Is it, to the sole and exclusive enjoyment of the business belonging to the office of port wardens as established by law or is it a business in which they may only be allowed to par-

ticipate in common with others who may assume to perform the same or similar functions?

The office of port wardens is one of considerable antiquity even here. It was established by law during the existence of the Colonial Government (1 Smith & Liv. 160); and it has been continued by repeated acts of legislation down to the present time, with but slight alterations. The last act and the one now in force, so far as regards the powers and duties of port wardens, in respect to the present question, was passed February 19, 1819: (Laws of 1842, Sess. ch. 18.) By this law they are made public officers. They are appointed as such by the Governor and Senate—are organized as a board or body politic under the name of the master and wardens of the port of New York, with power, in that name as a corporation, to sue for all fines, penalties and forfeitures arising under the act and to use a common seal. They take an oath of office, are required to have a clerk, and keep an office open where they are to give daily attendance and where their clerk is to keep a record or book of entries of all their proceedings, which is to be open to the inspection of all persons desiring it. The arrival of all foreign vessels is to be reported at their office under a penalty of fifty dollars for each vessel and certain fees are payable to them with the report of every such vessel. By the § 5 of the act their powers and duties, with respect to the survey of vessels and damaged goods are declared. They or any two of them, with the assistance of one or more skilful carpenters shall be surveyors of any vessel deemed unfit to proceed to sea. They or any two of them shall be judges of the repairs which may be necessary for the safety of such vessel on the intended voyage. And in all cases of vessels and goods arriving damaged and by the owner or consignee required to be sold at public auction on account of such damage and for the benefit of underwriters out of the city of New York, such sale shall be under their inspection; and when required by the owner or consignee, they shall certify the cause of the damage, the amount of sale of the vessel or goods and the charges attending the sale. For these and all other services their compensation is fixed in the shape of commissions and fees.

From this brief analysis of the statute and of the powers it has conferred and from the fact that a public office is created and that the persons appointed to fill it are, from the moment they enter upon their duties, public officers, I consider it follows that their powers are and necessarily must be deemed exclusive—such as no other persons, without a similar authority of law, are at liberty to perform. The statute is, of itself, a grant of powers to be exercised in the cases specified and in the manner pointed out for the purpose of . subserving the great interests of navigation and commerce in the port of New York. It is, in fact, the grant of an office in the nature of a franchise like the grant of a ferry or a toll bridge or of the right to hold a public fair or market and a similar grant for like purposes may, at any time afterwards, be made to others : See the great case of the rival bridges, 11 Peters' R. 420, for the principle. But, without the grant of a rival power from the same authority, individuals have no right to set up a rival office or business and assume to themselves the performance of the same public duties for the like emoluments. It matters not, in my judgment, whether there be any express prohibition or restraining law to prevent such rivalry or not. The grant itself in the case of an office of this sort implies a prohibition against its exercise by others, unless they can show an equal authority.

The language of the § 5 is imperative and, at the same time, explicit. The persons holding the office shall be surveyors ; they shall be judges of repairs ; sales shall be under their inspection ; and they shall certify the cause of damage, the amount and the charge attending the sale. This is tantamount to saying, they shall be the surveyors and the judges and the persons to perform the other prescribed duties and no other persons shall possess the same or similar powers. Then, to what does this exclusive power particularly relate and where is its limit ? It relates to a survey of vessels to ascertain their seaworthiness and the necessity and extent of repairs to enable them to prosecute the voyage in which they are engaged. It does not, of course, apply to or include vessels lying in port and requiring ordinary repairs or overhauling previous to taking on board a cargo : for, in all such .cases, the master and owners being alone interested, must

1843.

TYACK
v.
BROMLEY.

be left to determine for themselves the repairs and outfits; and they may or may not, as they shall think proper, call to their assistance third persons to determine for them. But this provision of the law does apply to every vessel actually engaged in the prosecution of a voyage and putting into port owing to some disaster or injury sustained which has interrupted its prosecution and also to vessels in port which, having taken cargo on board and being about to commence a voyage, have sprung a leak or met with some accident to affect their safety in the intended voyage. These are cases in which the regularly appointed master and wardens of the port have the exclusive right to hold surveys and to judge of the necessity and extent of repairs and to give the proper direction therefor. The reasons for vesting this power in persons selected for their skill and clothed with public authority is obvious enough : there may be others interested in the safety of the vessel besides the master and owners, as shippers of cargo, passengers embarking or placing property on board, mariners hired to go the voyage—all have a right to the judgment of impartial and disinterested men as to the safety and ability of a vessel to proceed to a successful termination of the voyage, after any disaster has occurred to her calculated to increase the hazard or to place property and lives in greater jeopardy. So, with respect to vessels and goods arriving in a damaged state and which, in consequence thereof, are required to be sold for the benefit of underwriters out of the city of New York—it is conceded by the defendants that the power belongs entirely and exclusively to the legally constituted master and wardens of the port to hold a survey and attend the sales and give the necessary certificates of the result.

But it is said, they can have no such exclusive and compulsory right where a vessel or goods have arrived in a damaged state and the same are insured by resident underwriters who are present to look after their own interest in the property. I agree to this proposition. It must be so. The law appears not to embrace the case in terms and there is no reason why it should. The owner or consignee and the underwriter being on the spot and seeing the damage, may agree upon the amount to be paid for loss without a previ-

ous survey or they may select any person to appraise the damage and agree to be bound by his report and award or, if they should deem a sale of the damaged property advisable, they may agree upon an auctioneer and the time and place of sale and may attend to see that the sale is fairly conducted; and having the result before them, they can then adjust and settle the amount of loss. And so, likewise, if the property should be abandoned to the underwriter, he, being present, may, at once, agree to accept it and pay for a total loss and immediately take possession and dispose of the property in his own way; for, in all such cases, there is no necessity for the intervention of the law through the medium of public officers. But, if a regular and formal survey should be deemed advisable or expedient for any purpose "on board of any ship or vessel or at any store in the city of New York or along the docks or wharves thereof on damaged goods," or "on board of any ship or vessel put into the port in distress to ascertain the damages sustained," whether with a view to a sale at auction or not, then it appears to me the port wardens are the only persons who can properly and legitimately make the surveys, because the law has prescribed certain fees which they shall be allowed to take for every such survey and for every certificate given in consequence of finding damaged goods and for every certificate of damages sustained by every ship or vessel which has put into the port in distress. A grant of fees or perquisites seems to me necessarily to include within it a grant of the power or authority to perform the service for which the fees are given; and it follows, also, that the grant is and must be of an exclusive character. The words quoted from the latter part of the § 5 are to this effect and this construction does not conflict with the liberty which the parties in interest have to dispense with surveys altogether by their mutual agreement in the cases which I have supposed or to call in third persons of their own choosing to perform a mere friendly unofficial act between them. But such persons cannot be employed as legally constituted surveyors of the port nor as surveyors to make and certify surveys in the manner and similitude of port wardens-surveys, nor with an intention that they shall have the same force and effect or any

other effect than belongs to the acts of mere individuals in a matter of private business.

There is a class of cases which clearly belong to the supervision of the port wardens and in which their services cannot be dispensed with, although there may be no necessity for effecting a sale either of the vessel or goods arriving in a damaged state within the letter of the statute. These are cases in which the government is concerned in respect to duties. The act of Congress (1 Story's Laws of the U. S. 625, § 60,) provides for the unloading of vessels free from duty which arrive in distress at ports to which they are not bound, upon the production to the collector, among other things, of the certificate of the wardens of the port showing the necessity for unloading the vessel. If there are such officers as port wardens at the place of arrival, they are the persons primarily and exclusively entitled to hold the surveys and to grant the certificates and the collector is not authorized to receive the certificates of any other persons; but if there be no such officers at the place, then the certificate of other persons may be received.

. If there are any other provisions in the revenue or navigation laws of the country having reference to official acts of port wardens as evidence for any purpose, then it is also clear that, in all those cases, they have a right to perform the service exclusively of all other persons, unless the law admits of a concurrent authority and right in others to do the same thing.

Having thus shown what appears to be the just conclusion in regard to the law conferring powers upon the port wardens and having pointed out in what particulars it is a grant of exclusive powers in virtue of their office and in what cases their services may be dispensed with, I would now observe that the appointment which the defendants have so publicly exhibited from the Chamber of Commerce and the Board of Underwriters can be of no avail to them against the legal rights of the complainants. If by that appointment it was intended, as it purports on its face, to clothe the defendants with authority as " marine surveyors for the port of New York" to act in all cases where surveys might be required of vessels and merchandize and to perform the same

duties in all respects as port wardens, then they have greatly mistaken the law and the powers which these mercantile institutions possess, however venerable the one and highly respectable both may be. They have no authority to make such an appointment or to sanction the establishment of a self-constituted and organized body of persons for the purpose of supplanting the lawfully constituted board of port wardens. Such an attempt would be an act of insubordination to the laws of the state, if not a downright usurpation of the powers of government, which it is hardly to be supposed could have been intended or contemplated. It is much easier to believe that what is made to assume the appearance of an appointment of public officers and the establishment of a rival office of marine surveyors was designed merely to recommend the individuals named as suitable persons to be employed in making surveys of sea damage wherever they can be thus employed without encroaching upon the rights of the complainants ; and it is to be regretted that, in granting that favor, they had not used words in that limited sense, instead of recommending them as marine surveyors for the port in all cases and without any discrimination.

It may be further observed, that if the office of port wardens as established by law is a monopoly and, for that or for any other reason of state policy or expediency at this day, ought to be suppressed and the business thereof thrown open to free competition or if the incumbents for the time being are not so competent or well skilled as others may think themselves to be or be thought by others to be to discharge its duties, it is not for individuals or mercantile associations or combinations of any sort to take the law into their own hands and treat it as a dead letter. So long as a statute remains unrepealed, it must be respected and obeyed, although it may seem to operate harshly by conferring exclusive rights and privileges on a few at the expense of the many. Courts of justice are bound to aid a party in possession of rights whether they be natural or artificial or such as are the mere creations of law, whenever those rights have been infringed or their destruction may be threatened. In the one case the grievance is redressed by the award of damages and, in

the other, a preventive remedy may be sought for in the extraordinary powers of a court of equity.

Then, is the present case one which calls for the latter remedy and is it within the well established bounds of this court's jurisdiction to grant it? It is objected, that there is a remedy at law. This may be very true ; but, still, it does not follow that chancery may not interfere. An action on the case every time the complainants' rights are invaded would be extremely troublesome. It might keep the complainants constantly on the alert to find out when they were injured and where to procure the necessary witnesses to prove it and from the frequency of the acts many of their rights could escape detection. The remedy by information in the nature of a *quo warranto* or by indictment as for a misdemeanor, which were suggested in argument, even if the case is within the provisions of the statute on either of those subjects which is, at least, doubtful, (2 R. 581, § 28 ; Ib. 696, § 39) might not afford that full and adequate relief to which the complainants are entitled. It is an old saying that prevention is better than cure ; and it holds good in cases of this sort.

Again—it is contended that the complainants should establish their right by a judgment at law before coming into a court of chancery. This, the court will sometimes require. In cases of doubt or difficulty on the law or the facts, it is discreet to await the decision of a court of law upon the legal right set up. But where a clear case of statutory or common law right is presented and the party is in the possession and enjoyment of the right which is being daily and continually violated, this court may and often does interfere without waiting the previous action of another court : *Livingston* v. *Van Ingen,* 9 John's R. 569, 570 and 585–587. With regard to the jurisdiction of the court of chancery in cases of this sort, I think it is abundantly established. Cases have occurred perfectly analogous in principle in which the power of this court by injunction has been exercised without hesitation and such cases are high authority as precedents. Indeed, it has become a familiar principle of equity jurisdiction to protect by injunction statutory rights and privileges which are threatened to be distroyed or rendered value-

less to the party by unauthorized interference of others. The first case I shall refer to is the *Croton Turnpike Company* v. *Ryder*, 1 John. Ch. R. 611, where Chancellor Kent held it to be settled that any injunction is the proper remedy to secure to a party the enjoyment of a statute privilege of which he is in the actual possession and when his legal title is not put in doubt. The English books, he observes, are full of cases arising under the branch of equity jurisdiction, but it was unnecessary to enter into a discussion of them, for the point had been then recently settled in this state on an appeal in the case of *Livingston* v. *Van Ingen*, in error before referred to. The jurisdiction he considered very benign and salutary : for, without it, the party would be exposed to constant and ruinous litigation as well as to have his rights excessively impaired by frauds and evasion.

The case referred to, *Livingston* v. *Van Ingen*, deserves a further notice, as being peculiarly applicable to the one in hand. It arose out of the grant of the legislature to Messrs. Livingston and Fulton of an exclusive right to navigate the water of the Hudson by steam-boats for the period of thirty years. The defendant, disregarding that act of the legislature, built and put a steam-boat upon the river in opposition to the complainants. They filed their bill for an injunction ; and upon an order to show cause before the then chancellor, Lansing, he refused the injunction—upon which the complainants appealed to the court for the correction of errors.

The defendants insisted that the grant was void on two grounds. First, that it interfered with the then power, which belonged entirely to congress, to promote the progress of science and useful arts, by securing to authors and inventors the exclusive right for limited times ; and, second, that it interfered with another power vested in congress by the constitution, viz., that of regulating commerce with foreign nations and among the several states—and, furthermore, that if the grant was such as the state legislature had a right to make, that the complainants should be left to the remedy which the legislature had in the act itself provided, viz., a forfeiture of the boat; and that, at all events, the court of chancery ought not to interfere by injunction, until these questions of law were determined and the right to the ex-

elusive navigation of the river was established. It was, however, decided, by the unanimous opinions of the judges, to be a proper case for the interference of the court by injunction, even in that preliminary stage of the cause. That the chancellor ought to have granted it; enjoining the defendants until the hearing of the cause; and then to be made perpetual, if the claim should be sustained: and the cause was remitted to the chancellor with directions to issue the injunction. Although, some years afterwards, the Livingston and Fulton monopoly of steam-boat navigation in the waters of New York was destroyed by the decision of the supreme court of the United States, in the great case of *Gibbons* v. *Ogden*, 9 Wheaton R. 1, upon the constitutional objection of its grant being repugnant to the power vested in congress to regulate commerce which was held to be exclusively there, and no part of which could be exercised by a state; yet that decision did not reach the point of chancery jurisdiction to sustain a statutory right or privilege under a supposed valid grant by its injunction, and that, too, in the inception of the controversy before the merits can be finally determined. So far from its impugning the doctrine of the state court upon that subject, the same high tribunal in the case of *Osborn* v. *The Bank of the United States*, decided, at the same term, 9 Wheaton 739, that an injunction was properly granted to prevent the franchise of a corporation from being destroyed, as to restrain a party from violating it, by attempting to participate in its exclusive privileges. The remarks of chief justice Marshall in his opinion of that case, on pages 841, 842, have a strong bearing in more respects than one on the case in hand.

In *The Newburgh Turnpike Company* v. *Miller*, 5 John. Ch. R. 101, Chancellor Kent again holds to this general doctrine that where one has a grant of a ferry-bridge or road, with the exclusive right of taking tolls, the erection of another ferry-bridge or road so near it as to create a competition injurious to such franchise is, in respect to such franchise, a nuisance: and this court will grant a perpetual injunction to secure the enjoyment of the statute franchise and prevent the use of the rival establishment. I may safely rest upon these authorities as perfectly decisive of the present

application: for I know not how to distinguish this case in principle or on what ground to place it where it will be beyond the reach of their direct influence.

It is unnecessary, therefore, to consider very particularly another ground on which the extraordinary powers of a court of equity are sometimes invoked. It is this—that supposing that the complainants have not the exclusive right to perfórm the duties which port wardens have been accustomed to perform, yet being organized as a board or public office, the defendants have no right, with the motives and intentions imputed to them and not yet denied, to establish a rival office with a precisely similar organization for doing business. That although they have adopted a different name, it is such an assimilation of their business and calling with that of the complainants as is calculated to mislead the public and to produce deception and fraud. Numerous cases have occurred of that character in which the court both here and in England has promptly interfered to prevent the mischief. One of the most striking is the *Omnibus case*, 2 Keen's R. 213, cited by Chancellor Walworth in *Bell* v. *Locke*, 8 Paige's C. R. 76. There, an injunction was granted and sustained upon an appeal, to prevent the defendant from running an omnibus, having upon it such names, words and devices as to form a colorable imitation of the words, names and devices which had been previously placed on the omnibusses of the plaintiffs with the evident intention of obtaining a part of the business by misleading and deceiving the public. According to the bill of the port wardens, their case would seem to be brought within that principle: but it is not necessary to place the decision which I am now called upon to make upon that ground. The other view of the case which I have endeavored to present entitles the complainants, in my opinion, to an injunction, though not to the full extent prayed for, inasmuch as the defendants individually have a right in common with all other citizens to be employed to make surveys to appraise damages and arbitrate whenever called upon or requested to do so by the mutual consent of the owner or consignee and the domestic or resident underwriter upon vessels or goods arriving damaged or becoming damaged in port where all parties in interest

are present and think proper to dispense with a regular and official survey by the port wardens and to employ them in their private capacities as citizens or individually to perform the service; with this modification or exception the injunction must go as prayed for.

There is another objection rather of form than of substance which was taken upon the argument and must not be entirely overlooked. The objection is that the bill is erroneously filed in the individual names of the master and wardens and their clerk and should be in their corporate name. This objection I think is not well taken. They are a corporation for certain purposes, that is to say, they have a name in law by which they may sue for fines and penalties which the law itself imposes in certain cases. But in all other cases and in all matters of business they are so many individuals associated together for one common object in which they are all interested and the income and emoluments of which are equally divided among them. They have a common benefit and bear a common burthen as partners; and for any injury or disturbance which affects that common interest, I can perceive no difficulty in allowing them to pursue the appropriate remedy in their own proper names.

*Note.*—This case was carried to the chancellor on an appeal; and while pending before him, the act of March 29, 1844, was passed (Laws of 1844, ch. 89, p. 81,) declaring the rights and for the relief of the master and wardens of the port of New York. By that act, the defendants, as well as all other persons, are expressly prohibited from performing or exercising or attempting or offering to perform or exercise any of the powers, functions or duties of the master and wardens of the port of New York conferred on or required of them by law or by the act of February 1819, or to receive any fee or reward for any such service—which powers, functions and duties are declared to be exclusively vested in and to belong to the master and wardens of the port of New York by virtue of their office. Under that act whatever the complainants are authorized to do by virtue of their

1843.

TYACK
*v.*
BROMLEY.

office the above defendants and all others are prohibited from doing under a heavy penalty.

The chancellor, however, gave an opinion, recognizing the decision of the vice-chancellor, except on one point ; and that was, in relation to the right of the wardens, as *ex officio* surveyors, to survey " *all* damaged goods brought into the port of New York in any ship or vessel." They had that exclusive right by the provisions of the act of 1759. It was incorporated into § 8 of 1784 (1 Greenl. 89) ; and the above words were contained in § 308 of the revised act of 1813, (2 R. S. of 1813, p. 459.) But from intention or accident, the words were left out in the law of 1819. The chancellor considered that the statement of a tariff of fees in the last mentioned act, while it showed that the wardens were not prohibited from acting in cases not expressly marked by the statute, yet that the fixing of such a tariff did not give the complainants the exclusive right to such service or allow them to enjoin others from performing similar services.

As to the main question, his honor observed :

" I agree with the vice-chancellor that the powers given to the complainants by the fifth section of the act of February 1819, (Laws 1819, p. 13) were in the nature of a franchise and in their nature exclusive, until the legislature should think proper to repeal or modify the law or should authorize others to perform the same duties. The statute creates or provides for the appointment of public officers and devolves upon them certain powers and duties which the interest of the public requires should be performed by persons duly authorized and selected in the mode prescribed by the sovereign power of the state. It was a palpable usurpation of power, therefore, for another body of men to attempt to perform the duties assigned to these officers under a different name of office and to establish a tariff of fees of office for the discharge of such duties.

"I have no doubt that the chamber of commerce and the board of underwriters of the city would be perfectly safe persons to entrust with the selection of officers to perform these particular duties. But, the sovereign power of the state had not thought proper to entrust them with that power. They, therefore, mistook the duty which they owed to that

sovereign power, when they assumed to constitute a board of public agents to discharge the duties which the legislature had conferred upon a board of officers to be appointed by the governor and senate."